## THE CREST.

## THE LENAPE.

## DILKES v. GREAT LAKES DREDGE & DOCK CO. et al.

### No. A–14663.

District Court, E. D. New York.
July 10, 1936.

Lynch, Hagen & Atkins, of New York City (H. C. Eidenbach, of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine, of New York City, of counsel), for the Crest.

Burnham, Bingham, Pillsbury, Dana & Gould, of Boston, Mass., and Burlingham, Veeder, Clark & Hupper, of New York City (Miles Wambaugh and Charles S. Bolster, both of Boston, Mass., of counsel), for the Lenape.

BYERS, District Judge.

This cause involves a collision in the Cape Cod Canal on October 18, 1934, at about 7:45 a. m., between the barge Cumru and the dredge Crest; that contact caused the barge Pottstown, towing alongside the first-named to starboard, to strike on the north bank of the canal. For damages so sustained by the barges, the libelant seeks to hold the dredge.

The latter has impleaded the tug Lenape which had the barges in tow. She was claimed by her captain as bailee, and the common ownership of the tug and barges is but thinly veiled; thus the languid part taken by libelant in the litigation is explained.

The tow was proceeding westerly through the canal, with a 4-knot current underfoot; there was a local pilot at the wheel, and the captain of the tug was in the pilot-house; he exercised authority just prior to the collision, as will be seen, and probably in entering the canal at all.

The tug Lenape is 170 feet over-all, 30 feet in beam and draws 17 feet, and has 1,000 h. p. engines.

The Cumru is a wooden barge, 256 feet long and 43 feet in beam.

The Pottstown, a craft of the same type, is 194½ feet long and 34½ feet in beam.

Both barges were light and were being towed abreast, on bridle hawsers, the length of which is in dispute.

The tug captain's testimony will be relied upon to the effect that there was 26 feet of open water between the taffrail of the tug and the bows of the barges.

The latter were held apart though lashed together, by 1-foot rope bumpers. Thus the greatest width of the tow was 78½ feet.

At the time in question the old 100-foot channel of the canal was being widened by an additional 70 feet. The canal runs approximately east to west, and the dredging had been carried forward in that direction. As the tow approached the bridge at Bourne, it was about to leave the already widened channel and to enter that portion in which the dredge was operating, off the south bank of the canal.

The entire 70 feet was being dredged on that side, in two equal strips, called the channel, outer, or No. 2 cut, and the bank, or No. 1 cut.

The Crest is a dipper dredge, 167 feet long and 48 feet in beam, and was held in position by three spuds, one on each side 18 feet aft of the bow, and the third at the center of the stern. The first two are flush with the sides and hence do not add to the beam of the dredge; each is of cast steel and weighs 58½ tons, and the stern spud weighs 50 tons and is of structural steel.

The method of operation was for the dredge to excavate in the No. 2 cut during the day time, discharging into a scow alongside to starboard. That scow would be taken away by a tug for dumping elsewhere. At night, when the navigation in the canal involved large vessels from New York and Boston, the dredge operated in the No. 1 or bank cut so as to render available the greatest width of channel.

In moving the dredge, if the tide was coming against the stern as it was on this occasion, the aft spud had to be in contact with the bottom if both the forward ones were raised, so as to keep the dredge from turning; this was called trailing the spud.

It will be seen that, when operating in the No. 2 cut, the dredge necessarily encroached upon the 100-foot channel, by the difference between her beam and the width of the cut, or about 13 feet.

The Crest was so at work in the No. 2 cut, between stations 327 and 328, on the morning of the collision.

The questions for decision are whether the tow was at fault for striking the dredge, and whether the dredge was at fault for not being in her required position at the time of collision.

■ Ordinarily the barges would have sued the tug for negligent towing, and the latter would have impleaded the dredge and assumed the affirmative against her.

It is not thought that the special relations of the parties, according to the record, should introduce a different requirement of proof to establish the rights and responsibilities of the various interests.

Accordingly the affirmative will lie with the tug on the question of the alleged fault of the dredge.

Counsel for the tug said at the hearing: "I state that we do not claim that she (the dredge) should have pulled back into the inner (No. 1) cut; we simply claim that she should have pulled in against the bank."

■ It is the court's view that counsel correctly stated that it was not the duty of the dredge to abandon her position in the No. 2 cut. The work of dredging had proceeded in the manner described for a long period of time; it could not be carried forward with regularity or dispatch otherwise; consequently the issue is narrowed down to this: Did the dredge unreasonably encroach upon the 100-foot channel?

It is found that she was operating as has been described, at station 328, with a scow alongside to starboard, at 7:20 a. m. when she was notified that the Lenape with two barges, arranged as stated, was approaching from the east. Prior to 7:44 a. m. the scow was moved into a position directly ahead of the dredge by the tug or tow boat Dempsey, which took its position directly ahead of the scow. This shifting was timely and is not criticised.

The assertion is that the dredge herself was not moved laterally to the south as much as possible, and that she was not parallel to the center of the channel, but that her stern extended northerly a matter of a few feet.

It must be recalled that, when counsel said she had not pulled against the bank, he did not mean the visible south shore of the canal, but the south slope of the widened channel as far as it had been dredged.

It is found that the additional 70 feet had been dredged as far as station 327 and that the Crest had moved forward into station 328, a matter of 25 feet or so. For about the rear half of her length more or less, the depth under her was 25 feet; as to the half forward of amidships, she was close to the south slope of the No. 2 cut under water, because the No. 1 cut would not be made until that night. It is found that she was as snug to that portion of the slope, at her forward end, as could reasonably be required of her. So much is not seriously disputed; Kennerly's testimony shows why this matter cannot be stated with precision.

As to the position of her stern, and whether it projected north of a line drawn from her starboard bow corner and parallel to the center of the old 100-foot channel, the answer depends upon the construction to be given to the evidence.

For the tug, the pilot, the captain, and the captain of the Cumru are relied upon; the first-named gave only an opinion, i. e., that he hardly thought the dredge was snug to the south bank (slope) of the No. 2 cut. The tug captain (of whom more later) said the stern of the dredge was more out in the channel than her bow, and the barge captain said she lay "cater-cornered."

The last two approached at an angle, for the tow was not following straight behind the tug, but was veering toward the south bank and was being towed toward the north bank under full speed (ordered by the captain of tug) just before and at contact, so that their angles of vision cannot be relied upon to establish the true facts.

Kennerly, called by the dredge, was the government inspector. He said he saw the collision, and had observed the tow's approach, after receiving notice of it from a man on the bank, whose duty it was to relay the information from the office of the canal dispatcher. He reported the notice to Hansen who was the operator of the dredge; as to the effect upon the latter of the striking, his "memory" was "that she stayed right where she was." He made a sketch of the position of the dredge after it had been struck (not in evidence) and

his testimony is that the bow of the dredge then lay 13 feet in the 100-foot channel, and the stern, 24 feet. He said: "That is within a foot or two, as I measured it afterwards."

It must be observed that a foot or two is quite important in this case, and that reliance upon this testimony to establish the position of the dredge before the accident requires acceptance of the statement that the dredge did not move under the impact of the blow struck by a 256-foot light barge, moving through the water at better than 7 knots, which was severe enough to damage her timbers.

Kennerly was a neutral witness and his testimony must be viewed in that light; its efficacy to persuade cannot depend upon one or more sentences from his deposition, but upon his opportunity to observe, and the recitation as a whole.

His narrative invites careful consideration because upon it the tug chiefly relies to establish fault on the part of the dredge.

He says he saw the collision; and also: "Shortly after that (his receipt of notice of the tow's approach) I went down to measure the scow. The scow was getting pretty well loaded, so I went down to measure the scow," that is, its contents.

If that was his occupation at the time of the collision, it could not have been followed except on the scow, which robs his deposition of vitality as to either the exact position of the dredge prior to the impact, or the effect thereof upon it.

His recital is consistent only with lack of movement by the dredge as distinguished from the scow. He described how the latter was taken from alongside the dredge, and held in place ahead of the Crest by the dipper, which rested upon or in the scow. He says all three spuds were down.

Incidentally it may be observed that, as the dredge was suspended from the spuds, when they were down, her capacity to swing as the result of this blow would depend upon whether the spuds, having been thrust into the canal bottom, would yield under the impact. As to that there is no testimony.

Bouchard in charge of the dredge, and Hansen the operator, both said that, after the report of the Lenape's approach was received, the dredge was lined up parallel with the 100-foot channel line. Thus Bouchard: "We let the port spud down, and raised the opposite spud, and pushed the stern in"—by use of the dipper. Hansen said: "I raised the port forward spud and the stern spud and pulled the stern in toward the south bank," i. e., with the dipper on the bottom.

If either was done before the scow was moved, the dipper was available for the purpose; if afterward, the narrative is not convincing.

The cross-examination of both witnesses fails to disclose any effort to prove that the dredge could not have been drawn in at the stern as recited, because the dipper was already employed in holding the scow in position. What these witnesses say in substance is that the dredge was moved, "lined up" so that about 10 feet of her starboard side was within the 100-foot channel, and that this was done before the scow was hauled ahead.

A choice must be made between Kennerly on the one hand, and Bouchard and Hansen on the other. The bias of the two latter might be relied upon to discount their testimony if Kennerly's post of observation or activity, just prior to the collision, placed him in a position to observe accurately just what took place. Neither creates the impression that his recital is so inherently probable that his testimony must be accepted, and that of Bouchard and Hansen rejected.

Accordingly it is found that the dredge projected on her starboard side from 10 to 12 feet within the 100-foot channel, and that she lay substantially parallel to the center thereof at the time of collision.

Even if the court is mistaken in thus viewing the evidence, it must be recalled that dredging operations are not conducted with the precision required in establishing the boundary lines of city lots. The character of the bottom here involved was not uniform, nor was the toe of the south slope of the old channel; the dredge and the scow were functioning on a wide curve and in waters in which the current ran from 4 to 5 knots and had been observed as high as 7. These conditions admit of some tolerance in trying to establish within 8 or 10 feet, the exact position of the stern of the Crest at the time in question. There were special ranges on the shore placed in position to facilitate "lining up" accurately so that the dredge could "walk ahead" straight after cutting 25 feet or so of chan-

nel, and those ranges were adhered to, according to the credible testimony. This does not mean that the dredge could always maintain herself in a mathematical parallel to the center line of the old channel, but it has not been shown against her, that she was in a position at the time of the collision that she was not lawfully entitled to occupy in order to prosecute her task, even though that had to be suspended because of the oncoming tow.

This means that fault on the part of the dredge Crest has not been shown. The conclusion has not been arrived at without considering carefully The Ticeline (C.C.A.) 239 F. 119; The Anna W. (C.C.A.) 22 F.(2d) 273, and George D. Perry Scow Corporation v. Steamtug Robert H. Smith, 1934 A.M.C. 150, relied upon by the Lenape.

The first two do not show that this dredge was not in a reasonable and proper position at the time of collision; perhaps if the third case were deemed to establish the rule that a dredge cannot lawfully remain partly within the edge of a channel when it is engaged in widening that channel, it would be an authority in this tug's favor. It is not so construed.

In The Ticeline and The Anna W. Cases, the dredges were condemned for doing nothing to aid navigation; here the dredge concededly moved her scow, as the tug's pilot says, as his tow was approaching, even though she may be thought not to have shifted her own position, according to Bouchard and Hansen.

It should be said that Information Bulletin No. 3 issued by the United States Engineers Office in Charge, for the period from October 16 to 31, 1934, gave notice that the Crest with attending tugs and scows would be engaged as stated (also that another dredge and pile driver would be operating in the canal); it contained a sketch showing the canal and the expected positions of all equipment. The Crest was substantially in the position so shown, when the collision occurred.

Paragraph 4 of that Bulletin reads: "All of the above mentioned plant will move to the side of the canal to permit the passage of any boat using the canal."

The testimony of Captain Colbeth, U. S. A. Superintendent of the canal, is clearly to the effect that the moving of the scow to favor navigation under the existing circumstances was all that was required of this dredge.

There remains to consider whether the tug was at fault. This subject does not admit of extended consideration because of the practical aspect of the controversy as previously recorded.

The tug's captain took her into the canal, and then the pilot boarded her, inside the breakwater. The former said: "If I had known the mud-digger was there, I wouldn't have went through." He (and therefore the tug) is chargeable with that knowledge; he knew a pilot had been arranged for, and was at fault for not holding his tow outside the entrance to the canal, until the pilot could come aboard and assume responsibility for the further handling of the tow.

The pilot did know of the location and handling of the dredge, but it is impossible to say whether he took up his duties too late to influence the decision to proceed. There are dolphins at or near the easterly entrance, where the tow could have hung up, so that one barge at a time could have been taken through, either alongside the tug or on a hawser. If those dolphins had been passed when the pilot boarded the tug, the tow had to continue as she was then made up. As the tug captain and the pilot say they do not clearly recall the facts as to this, no finding can be made.

The pilot held a license as such, and had acted as a Cape Cod Canal pilot since 1914; he was a resident of Bourne; it was his calling to take vessels through the canal. He is found to have known where the Crest was on this morning and how she was operating; that she encroached upon the 100-foot channel in widening the canal as stated; that it was customary for her to haul her scow ahead, and she was so required, to accommodate navigation; that he could reasonably count on 87 feet of channel in which to navigate a tow having a width of 78½ feet; that the tow would veer toward the south side of the canal, in approaching and passing the dredge, due to the curving course of the canal; that with the tide underfoot of a 4-knot strength the tow would not be expected to follow straight behind. These matters necessarily imputed to him an understanding that the operation was hazardous, and could succeed without trouble only if attended by good fortune.

It is found from his own testimony, that the dredge did what he expected her to do, namely, it shifted the scow, as he observed, after he came within sight of the Crest.

534

It is found that the pilot made no claim, after the collision, that the stern of the dredge projected into the channel more than the bow.

It is found that the cause of the collision was the veering of the tow toward the south side of the canal, as it approached the dredge, and the failure of the tug to hold the tow sufficiently close to the north side to avoid the striking of the dredge Crest by the Cumru, which in turn caused the Pottstown to sustain the damages alleged in the libel.

It would seem that prudent navigation would have dictated the anchoring of one of the barges, even after the trip through the canal was begun, but no finding of fault can be based upon the failure to do that, in the absence of evidence that it was practicable.

The testimony is quite clear to the effect that tows of such width as this were not customarily taken through the canal while the dredging was being done. It was usual to tow such large seagoing barges singly, and it was the tug's failure to do this which must be held to be the cause of the damage.

Settle decree, and findings if desired, on notice, dismissing the libel with costs as to the dredge, and holding the tug liable under the impleading petition, to the libelant, without costs.